# In the United States Court of Federal Claims

No. 18-412C
(Filed: October 23, 2020)

| | | |
|---|---|---|
| CHEREOKEE GENERAL CORPORATION, | ) ) ) | Keywords: Motion for Summary Judgment; Breach of Contract; Contracting Officer Final Decision; Contract Disputes Act; Default Termination; Conversion to Termination for Convenience; Constructive Changes; Differing Site Conditions |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

*Jonathan DeMella*, Davis Wright Tremaine LLP, Seattle, WA, for Plaintiff.

*Sosun Bae*, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Patricia M. McCarthy*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Ethan P. Davis*, Acting Assistant Attorney General, for Defendant.

**OPINION AND ORDER**

**KAPLAN, Judge.**

In September of 2016, the United States Army Corps of Engineers ("USACE") and plaintiff Cherokee General Corporation ("CGC") entered a contract for the repair and reconstruction of a military airstrip. USACE terminated the contract for default in June 2017, citing a lack of confidence in CGC's ability to timely complete the work required. In this suit, CGC challenges the termination, arguing that any delays in its performance were either caused by constructive changes to the contract and/or differing site conditions, or were otherwise excusable because they were the result of unforeseeable circumstances that were beyond CGC's control. It requests that the default termination be converted to one for convenience and that it be awarded damages to compensate it for additional expenses it incurred as a result of the alleged constructive changes and differing site conditions.

Currently before the Court is CGC's motion for summary judgment and the government's cross-motion for partial summary judgment. CGC contends that the material facts are not in dispute and that it is entitled as a matter of law to a judgment that the default termination was arbitrary, capricious, and contrary to law. The government, for its part, seeks partial summary judgment on several discrete issues, including whether CGC was in default as of the time that the

contract was terminated, whether CGC's differing site condition claim is defective as a matter of law, and whether—assuming the Court were to convert the default termination to one for convenience—CGC may recover associated damages in this action or must instead file a settlement proposal with the contracting officer ("CO").

For the reasons set forth below, CGC's motion is denied in its entirety. The government's motion is granted-in-part as to CGC's differing site conditions claim and the damages issue. Otherwise, it is denied.

## BACKGROUND[1]

### I.  Facts

In 2016, the Air Force and other military stakeholders asked the USACE to procure the services of a contractor to repair and improve a military airstrip at the Selah Airfield, which is located at the Yakima Training Center in Washington State. Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") Ex. 5, at 33,[2] ECF No. 54-1; App. to Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. for Partial Summ. J. ("App. to Def.'s Cross-Mot. & Resp.") at 289, ECF No. 59-1. The airstrip had been built in 1958 and was reconstructed in 1976 to accommodate C-130 aircraft in deployment exercises. Def.'s Resp. in Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. for Partial Summ. J. ("Def.'s Cross-Mot. and Resp.") at 2, ECF No. 59; App. to Def.'s Cross-Mot. & Resp. at 289. More recently (since 2003) the airstrip had sat vacant and in a state of disrepair. Pl.'s Mot. Ex. 2 ("Manville Dep."), at 57, ECF No. 54 (Deposition of Alan Manville at 38:9–16).

According to CGC, when the military decided to repair the airstrip in 2016, it was primarily motivated by its desire to use the airstrip in the summer of 2017 for a high-profile combat-readiness exercise referred to as "Mobility Guardian." Pl.'s Mot. at 2 (citing Manville Dep. at 38). The government disagrees with CGC's characterization of the military's motivation for undertaking the repairs. It contends that the military "intended the Selah project to constitute a long-term repair to the airstrip to facilitate its use as an assault strip for C-17 operations," and that it was only incidentally motivated by its interest in conducting the Mobility Guardian exercise there. Def.'s Cross-Mot. & Resp. at 3.

In any event, on August 2, 2016, USACE issued Request for Proposal W912DW-16-R-0031, "YTC Repair Selah Airstrip." Pl.'s Mot. at 4; Pl.'s Mot. Ex. 11, at 87, ECF No. 54-2 (Task Order Request For Proposal). Some six weeks later, on September 16, 2016, it selected CGC to perform the work pursuant to a fixed price Task Order No. 0012 ("the contract") under Multiple Award Task Order Contract No. W912DW-14-D-1002. Pl.'s Mot. Ex. 5. The contract was in the amount of more than $7.2 million and required the "reconstruction of all airfield pavement surfaces" on the Selah Airstrip. Id. at 11, 33.

USACE issued a Notice to Proceed ("NTP") on September 29, 2016, which triggered CGC's obligation to begin work on the project within ten days and to complete performance

---

[1] The facts in this section are based upon the materials the parties submitted in connection with their motions for summary judgment. Except as noted, the facts set forth are not in dispute.
[2] The page numbers for plaintiff's exhibits to its motion for summary judgment reflect the pagination of the Court's electronic filing system.

within 240 calendar days, or by May 27, 2017. Def.'s Cross-Mot. & Resp at 5; App. to Def.'s Cross-Mot. & Resp. at 38 (USACE's September 29, 2016 email to CGC confirming the issuance of a Notice to Proceed).

In the months that followed the issuance of the NTP, the project experienced numerous delays which are described in detail in the parties' briefs. The parties disagree about whether the fault for the delays lies with CGC, with the USACE, or with other circumstances beyond CGC's control. They also disagree about whether some of the work USACE directed CGC to perform, which resulted in additional delay and expense, was required by the contract or instead was necessitated by constructive changes to the contract. They further are at odds about the extent to which various delays affected the critical path of performance.

In any event, in an April 2017 change order, USACE extended the contract completion date forty-nine days—to July 15, 2017. Pl.'s Mot. Ex. 31 at 94, ECF No. 54-4. It set July 10 for completion of the runway and turnaround only. Id. By May 15, 2017, USACE concluded that CGC would not be able to meet the deadline for completion of the runway in time for the Mobility Guardian exercise. Pl.'s Mot. Ex. 77, ECF No. 54-5. On June 8, 2017, after issuing a Show Cause Notice to CGC and considering its response, USACE terminated the contract for default. App. to Def.'s Cross-Mot. & Resp. at 221−22 (Termination for Default Notice).

## II.    Proceedings Before this Court

### A.    CGC's Claims

On December 14, 2017, some six months after USACE terminated the contract, CGC submitted a certified claim alleging that the default termination was improper and seeking payment for work performed, along with damages, amounting to $4,128,915.66. Compl. ¶ 49, ECF No. 1; App. to Def.'s Cross-Mot. & Resp. at 223, 357, 613. CGC alleged, among other things, that delays in the project were excusable because they resulted from design changes imposed by USACE, unexpected soil conditions, severe weather conditions, and other circumstances not within CGC's control. App. to Def.'s Cross-Mot. & Resp. at 223−24.

CGC filed a complaint in this Court on March 19, 2018. In it, CGC requests that the Court convert the termination for default to a termination for convenience and that it also order "an award of damages commensurate with a termination for convenience." Compl. at 14.

In the meantime, several months later, on July 9, 2018, Contracting Officer Susan Newby issued a Final Decision denying CGC's December 14, 2017 certified claim in its entirety. App. to Def.'s Cross-Mot. & Resp. at 223–87 (Contracting Officer's Final Decision, dated July 9, 2018). In the wake of that decision, CGC filed an amended complaint with this Court on July 19, 2018. 1st Am. Compl., ECF No. 10. The amended complaint added a claim for damages in the amount of $4,128,915.55 based on USACE's "fail[ure] to modify the [c]ontract and compensate CGC for the increased costs and delays caused by differing site conditions, design changes, and [p]roject delays." Id. ¶¶ 63, 64.

On September 11, 2018, Contracting Officer Newby issued a third final decision. App. to Def.'s Cross-Mot. & Resp. at 357. In this decision, the CO demanded that CGC reimburse

3

USACE for its re-procurement and related costs, and that it pay liquidated damages and repair costs, in the amount of $7,434,842.10. Id. In response, on October 1, 2018, CGC filed a second amended complaint in which it added a request that the Court rule that USACE was not entitled to recover re-procurement costs or any other payment from CGC. See 2d Am. Compl., ECF No. 17.

Finally, on June 3, 2019, CGC filed an unopposed motion to file a third amended complaint. Consent Mot. Regarding 3d Am. Compl., ECF No. 32. That complaint included a reduction in the amount of damages CGC sought, lowering the claim from $4,128,915.55 to $3,084,449. 3d Am. Compl. ¶ 74, ECF No. 34. The Court granted the motion, ECF No. 33, and the third amended complaint, which is the currently operative complaint, was filed on June 7, 2019. 3d Am. Compl.

### B. The Government's Counterclaims

On June 21, 2019, the government filed its answer to CGC's third amended complaint. Def.'s Am. Answer and Countercl., ECF No. 35. The answer set forth counterclaims for damages totaling $7,434,842.10. Id. ¶ 105. These included claims for: 1) reimbursement of some $110,000 in re-procurement costs incurred to hire a new contractor to complete work on the airstrip; 2) damages of over $3.4 million representing increased costs for the replacement contract; 3) over $3.2 million for repairs to the project site allegedly necessitated by CGC's over-excavation and placement of improper fill material in certain areas; and 4) $641,190 in liquidated damages based on 435 days of delay in the completion of the contract. Id. ¶ 103.

### C. The Cross-Motions for Summary Judgment

On April 1, 2020, after a period of discovery, CGC filed a motion for summary judgment. Pl.'s Mot. In its motion, CGC contends that the undisputed facts establish that the termination for default was arbitrary, capricious, and contrary to law. The government filed its response and a cross-motion for partial summary judgment on May 15, 2020, in which, as noted above, it requests summary judgment be entered in its favor as to several discrete issues. Def.'s Cross-Mot. & Resp. CGC filed its reply and opposition to the cross-motion on June 12, 2020. Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Partial Summ. J., ECF No. 62. The government filed a reply in support of its cross-motion for summary judgment on July 2, 2020. Def.'s Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 68. Oral argument was held on the cross-motions via video conference September 22, 2020.

## DISCUSSION

### I. Jurisdiction

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012). Subsection (a)(2) of section 1491 further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the Contract Disputes Act

("CDA"), 41 U.S.C. §§ 7101 et seq.—"including a dispute concerning termination of a contract." 28 U.S.C. § 1491(a)(2).

The CDA, in turn, has its own jurisdictional requirements. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010). In particular, it states that a contractor may bring an action de novo in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3). The Federal Circuit has therefore held that to invoke this court's jurisdiction, the contractor must have first submitted a valid claim to the contracting officer and received the contracting officer's final decision on that claim. M. Maropakis Carpentry, 609 F.3d at 1327–28; see also Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; [it] was not designed to serve as an alternative administrative remedy, available at the contractor's option.").

In this case, it is undisputed that all of the claims before the Court were the subject of final decisions by the contracting officer. Further, CGC filed its complaint within one year of the CO's decision to terminate the contract for default, and then timely amended its complaint to address the claims the CO resolved in subsequent decisions. This Court therefore has jurisdiction over the case pursuant to the Tucker Act and the CDA.

## II.     Standard for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Rules of the Court of Federal Claims 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250. The "party seeking summary judgment always bears the initial responsibility of informing [the court] of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must "identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. Moreover, at the summary judgment stage, all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Id. The court should act with caution when granting a motion for summary judgment, and it is appropriate to deny such a motion "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## III.    Default Terminations Based on a Contractor's Failure to Make Progress

"As a general matter, government contracting officers have 'broad discretion to determine whether to terminate a contract for default.'" Allen Eng'g Contractor Inc. v. United States, 611 F. App'x 701, 705 (Fed. Cir. 2015) (quoting Lanterman v. United States, 75 Fed. Cl. 731, 733–34 (2007)). The court may "overturn[] those decisions only if they are arbitrary, capricious, or an abuse of discretion." Id.

Nonetheless, a termination for default is a "drastic sanction" and "should be imposed (or sustained) only for good grounds and on solid evidence." J.D. Hedin Constr. Co. v. United

States, 408 F.2d 424, 431 (Ct. Cl. 1969). In the case of a fixed-price construction contract, a default termination may be appropriate where "the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in the contract including any extension." 48 C.F.R. § 52.249-10(a).

A termination based on the contractor's refusal or inability to perform the work with the necessary diligence is appropriate where the contracting officer reasonably believed that "there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting RFI Shield-Rooms, ASBCA Nos. 17374, 17991,77-2 BCA (CCH) ¶ 12,714, 61,735 (Aug. 11, 1977)); see also Disc. Co. v. United States, 554 F.2d 435, 441 (Ct. Cl. 1977) (finding default termination appropriate in light of contractor's dilatory performance that made the CO "justifiably insecure about the contract's timely completion"). If, however, "[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor," then "[t]he Contractor's right to proceed shall not be terminated nor the Contractor charged with damages." Id. at § 52.249-10(b). "Examples of such causes include (i) acts of God or of the public enemy, (ii) acts of the Government in either its sovereign or contractual capacity, (iii) acts of another Contractor in the performance of a contract with the Government, (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers." Id.

The government bears the initial burden of proving a contractor's "demonstrated lack of diligence" which "indicat[ed] that [the government] could not be assured of timely completion." Lisbon Contractors, 828 F.2d at 765. The "factors usually relied upon by courts and contract boards" to determine whether the government has met its burden include "a comparison of the percentage of work completed and the amount of time remaining under the contract; the contractor's failure to meet progress milestones; problems with subcontractors and suppliers; the contractor's financial situation; as well as a contractor's performance history; and other pertinent circumstances." McDonnell Douglas Corp. v. United States (McDonnell Douglas XII), 323 F.3d 1006, 1016–17 (Fed. Cir. 2003) (citations omitted). If the government meets its burden of proof, then the burden shifts to the contractor to show that its default was excusable. Vanquish Worldwide, LLC v. United States, 140 Fed. Cl. 460, 476 (2018); see also Keeter Trading Co., Inc. v. United States, 79 Fed. Cl. 243, 253 (2007) (explaining that a plaintiff may demonstrate excusable default "by showing that improper government actions were the primary or controlling cause of the default and rendered the contractor financially unable to perform").

**IV.    CGC's Motion**

    **A.    Contract Completion Date**

In its motion for summary judgment, CGC argues that the default termination was improper because there was no formal contract completion date ("CCD") for the entire project against which its progress could be measured. The government disagrees with the premise of this argument. In its view, the contract completion date was July 15, 2017, as specified in the

unpriced change order. Pl.'s Mot. Ex. 34 at 108, ECF No. 54-4. CGC, on the other hand, characterizes July 15, 2017 as merely a "milestone" that USACE set for completion of the runway and turnaround. Pl.'s Mot. at 13.

The Court sees no reason to determine whether July 15, 2017, some other date, or no date at all was set for completion of performance. To be sure, the time remaining for performance is a relevant factor to be considered in reviewing a default termination based on a failure to make progress. But even where there is no formal CCD specified at all, a termination for failure to make progress may still be justified based on the totality of the circumstances. McDonnell Douglas Corp. v. United States (McDonnell Douglas XIV), 567 F.3d 1340, 1347–51 (Fed. Cir. 2009) (declining to adopt a "broad categorical rule" that "the absence of a contract completion date per se precludes the government from ever justifiably terminating a contract for failure to make progress"). The circumstances to be considered include "the contractor's failure to meet progress milestones, its problems with subcontractors and suppliers, its financial situation, and its performance history." Id. at 1351 (citing McDonnell Douglas XII, 323 F.3d at 1017). Therefore, even if the Court agreed that there was no formal CCD (a matter on which it expresses no opinion), CGC would not be entitled to summary judgment on that basis.

### B.  The CO's Alleged Failure to Engage in Reasoned Decision Making

Leaving aside the CCD, CGC contends that it is entitled to summary judgment because—according to CGC—it is undisputed that when the CO decided to terminate the contract for default, she: 1) did not consider extensions of time to which CGC was allegedly entitled; 2) relied on inaccurate information about the amount of work remaining to be performed; 3) had not conducted a scheduling analysis to allow her to determine CGC's ability to perform the contract within the remaining contract time; and 4) did not take into consideration how long it would take a follow-on contractor to perform the work. See Pl.'s Mot. at 32–33.

The government takes issue with CGC's allegations that the CO failed to engage in reasoned decision making when she terminated the contract for default. It observes that the project team kept the CO informed of project delays on a regular basis and that she relied on the information the team provided in determining that a default termination was warranted. See, e.g., Pl.'s Mot. Ex. 45, ECF No. 54-5 (May 2, 2017 email from Project Engineer to CO); Pl.'s Mot. Ex. 35 ("Newby Dep."), at 119, ECF No. 54-4 (deposition of CO Susan Newby at 30:12–32:10); Pl.'s Mot. Ex. 21, ECF No. 54-3 (January 24, 2017 cure notice); Pl.'s Mot. Ex. 79, ECF No. 54-5 (May 26, 2017 show cause notice); App. to Def.'s Cross-Mot. & Resp. at 324–26 (Declaration of Roger Williams).

CGC draws the Court's attention to the transcript of the CO's deposition in which, as it notes, she frequently could not recall the specific information she considered when she made the default termination decision. Pl.'s Mot. at 38 n.165 (citing Newby Dep.). When asked, however, if she recalled "specifically reviewing the factors listed in the FAR provisions prior to issuing [her] termination decision," the CO replied, "[y]es, we did." App. to Def.'s Cross-Mot. & Resp. at 684–85 (deposition of CO Susan Newby at 128:24–129:3). Indulging all reasonable inferences in favor of the government, the Court is not persuaded that the undisputed facts show that when the CO terminated the contract for default she did not consider the factors set forth in FAR § 49.402-3(f), as CGC argues.

Further, and in any event, CGC's focus on the alleged flaws in the CO's decision-making process is misplaced. This Court does not use an Administrative Procedure Act style standard of review in cases that arise under the CDA. Its review is de novo. See 41 U.S.C. § 7104(b)(4). And its "review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry." McDonnell Douglas XII, 323 F.3d at 1016 (citing Lisbon Contractors, 828 F.2d at 766–67). "[A]lthough the contracting officer's testimony and contemporaneous documents are relevant to [the default] determination, the trial court may also consider other factors usually relied upon by courts and contract boards." Id. These include "a comparison of the percentage of work completed and the amount of time remaining under the contract," "the contractor's failure to meet progress milestones," "problems with subcontractors and suppliers," "the contractor's financial situation," and "a contractor's performance history." Id. at 1016–17 (citations omitted).

The Court, in short, "is not limited to the grounds for default enumerated in the contracting officer's letter." Emiabata v. United States, 139 Fed. Cl. 418, 422 (2018), aff'd, 792 F. App'x 931 (Fed. Cir. 2019). In fact, it may sustain a default termination "for all of the reasons noted by the contracting officer at the time," or "for any additional valid reason." Id.; see also Empire Energy Mgmt. Sys., Inc. v. Roche, 362 F.3d 1343, 1357 (Fed. Cir. 2004) (observing that the court of appeals has "consistently approved default terminations where the contracting officer's ground for termination was not sustainable if there was another existing ground for a default termination, regardless of whether that ground was known to the contracting officer at the time of the termination"); Kelso v. Kirk Bros. Mech. Contractors, 16 F.3d 1173, 1175 (Fed. Cir. 1994) (citing Joseph Morton Co. v. United States, 757 F.2d 1273, 1277 (Fed. Cir. 1985)) ("This court sustains a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason."); Liquidating Tr. Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. 338, 383 (2014) (citing Empire Energy, 362 F.3d at 1357) (the government "may rely on any rationale justifying the default termination decision based in facts that existed at the time of termination"); Tr. Title Co. v. United States, 118 Fed. Cl. 99, 120 (2014), aff'd, 610 F. App'x 1014 (Fed. Cir. 2015) (same).

CGC's reliance on Judge Smith's decision in Alutiiq Mfg. Contractors, LLC v. United States, 143 Fed. Cl. 689 (2019) is unavailing. In that case, in converting a termination for default to a termination for convenience, the court focused upon analytical errors the contracting officer committed, some of which the CO here also committed according to CGC. CGC claims that these errors included, among others, not discussing excusable delay and not considering whether the contractor would be able to complete the contract as soon as or before any replacement contractor.

This Court, of course, is not bound by Alutiiq. Moreover, Alutiiq is distinguishable from this case because Judge Smith found that certain agency officials had acted in bad faith in Alutiiq. See 143 Fed. Cl. at 698 (finding that the contracting officer's representative was hostile to the contractor and its owners, and that he had a "history of dishonesty"). As the court of appeals held in McDonnell Douglas X, "the government may not use default as a pretext for terminating a contract for reasons unrelated to performance." McDonnell Douglas Corp. v. United States (McDonnell Douglas X), 182 F.3d 1319, 1329 (Fed. Cir. 1999). Where pretext is alleged, the CO's decision-making process may bear on the bona fides of the default termination

decision. Id. at 1326 (citing U.S. Fidelity & Guaranty Co. v. United States, 676 F.2d 622, 630 (Ct. Cl. 1982)) (observing that "evidence of subjective bad faith on the part of the government official" as well as "whether the official violated an applicable statute or regulation" must be considered where a default is alleged to have been used as a pretext for terminating a contract for reasons unrelated to performance).

In this case, however, CGC does not allege that the CO acted in bad faith or cited delayed performance as a pretextual reason for terminating the contract. Rather, it contends that her views concerning CGC's performance were uninformed and were not based on a reasoned analysis. For the reasons set forth above, even if the facts upon which CGC relies to establish these propositions were undisputed, which the Court has found not to be the case, CGC would not be entitled to summary judgment because this Court must review the reasonableness of the default termination on a de novo basis.

### C.  Factual Disputes Preclude Summary Judgment Regarding Whether the Default Termination Was Objectively Reasonable

Reviewing the issue de novo, and applying an objective standard, there are many material facts in dispute concerning whether and to what extent the delays that hampered CGC's progress were excusable and/or whether CGC was entitled to additional time to complete performance. For example, one of CGC's central contentions is that USACE constructively changed the contract when it required CGC to build a runway that was "crowned" at the centerline with a three-way slope, instead of authorizing it to replace the existing two-way cross-slope runway. Pl.'s Mot. at 10. CGC alleges that this was "one of the most significant changes to the Project's design responsible for critical path delay and increased cost." Id. at 9. The government, on the other hand, contends that the contract required the use of a crown in the runway design. Def.'s Cross-Mot. & Resp. at 35–38.

The interpretation of a contract involves a legal question and so "is generally amenable to summary judgment." Premier Off. Complex of Parma, LLC v. United States, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citation omitted). In this case, however, the interpretation of the contract's requirements turns on the meaning of the contract's technical criteria, which in turn requires consideration of technical drawings, specified "Unified Facilities Criteria," and certain engineering standards. Pl.'s Mot. at 11. Disputes that center on these kinds of technical issues are not well suited to resolution on a paper record through summary judgment.

Similarly, the Court finds not well suited to summary judgment CGC's claim that delays were caused by the "significant undisclosed and unforeseen saturated soils" that it encountered on the project site in April of 2017. Pl.'s Mot. at 14 (citing Pl.'s Mot. Ex. 41, ECF No. 54-4). According to CGC, its work was impeded because of the difficulties of installing the required layer of shot rock on top of the wet soils. Pl.'s Mot. at 14–15. It also alleges that during this period, and in violation of contractual specifications, USACE failed to respond to its requests for directions about how to proceed in light of the soft soil conditions. Id. at 14–19. And it claims that as a result of the wet soils and the requirement that it use a crown design, as well as the uneven nature of the shot rock under the existing runway, the quantity of aggregate it needed to produce to complete the project was greater than anticipated which "substantially increased the

cost and work for the project." Pl.'s Mot. at 11 (citing Pl.'s Mot. Ex. 28, ECF No. 54-4 (Email from USACE engineer Rob Didenhover dated May 2, 2017)).

USACE has a different perspective. It contends that "CGC struggled with the project from the outset, falling behind schedule early as a result of its failure to manage its subcontractors and provide required submittals." Def.'s Cross-Mot. & Resp. at 2; see also id. at 6–7.[3] In addition, according to the government, CGC's performance reflected a "lack of familiarity with the contract requirements and an inability to produce contract-compliant material" (i.e., aggregate material). Id. at 1; see also id. at 5–8, 29–31, 34–35. Specifically, citing its geotechnical expert, the government argues that it was CGC's inability to produce aggregate that met contract specifications, and not the wet soils it encountered, that caused the compaction issues that CGC alleges delayed its progress. Id. at 31–32. The government also takes issue with CGC's allegations that the delays caused by the lack of a uniform shot rock layer were excusable. It argues that CGC's final design failed to account for the uneven base layer, and that a decision about how to address the issue was for CGC to make under the contract. Id. at 49 (citing App. to Def.'s Cross-Mot. & Resp. at 709 (deposition of the engineering manager Todd Sawin of AHBL Inc., the Selah airstrip project designer, at 131:13–17)).

Each of the parties has hired a scheduling expert to opine regarding the extent to which the delays that occurred affected the critical path of performance. See Sauer Inc. v. Danzig, 224 F.3d 1340, 1345 (Fed. Cir. 2000) (contractor must prove that excusable delays "affect[ed] the critical path of performance," i.e., that they delayed overall contract completion). Each has also hired a geotechnical expert to address CGC's allegations regarding unsuitable soils and differing site conditions.

The foregoing discussion of the parties' conflicting claims and assertions regarding the causes of the delays in performance of the contract is not exhaustive. It is clear to the Court, however, that—given the technical nature of the issues and the parties' reliance upon expert testimony to support their conflicting positions—summary judgment is not an appropriate vehicle for determining the reasonableness of the default termination decision. See Metric Const. Co. v. United States, 73 Fed. Cl. 611, 614 (2006) (citing Young Enters., Inc. v. United States, 26 Cl. Ct. 858, 863 (1992)) ("When the factual context of a construction project is not yet fully understood by the court, it may be inappropriate to decide a claim on summary judgment which depends on information that has only been partially explained in the parties' briefs."); see also SunTiger, Inc. v. Sci. Rsch. Funding Grp., 189 F.3d 1327, 1333 (Fed. Cir. 1999) (quoting 12 James WM. Moore et al., Moore's Federal Practice § 56.41 (3d ed. 1999)) ("The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it if in the court's opinion, the case would benefit from a full hearing."). CGC's motion for summary judgment is accordingly **DENIED**.

---

[3] While the government's scheduling expert testified that by the end of March 2017, CGC had recovered the time it lost as a result of these delays, App. to Def.'s Cross-Mot. & Resp. at 442, the government contends that the early delays are relevant because they provide further support for USACE's lingering lack of confidence in CGC's ability to timely complete the project, Def.'s Cross-Mot. & Resp. at 26 n.15.

## V.     The Government's Motion

### A.     <u>Summary Judgment Regarding Whether CGC Was in Default at the Time of the Termination</u>

The government has filed a cross-motion for summary judgment as to several discrete issues. First, the government contends that there is no genuine dispute that "[a]t the time of termination it was not reasonably likely that CGC could have completed its work on the contract within the time remaining." Def.'s Cross-Mot. & Resp. at 39. Therefore, according to the government, it has met its burden of showing CGC was in default, which would shift the burden to CGC at trial to prove excusable delay. <u>Id.</u>

Second, the government contends, it is entitled to summary judgment because CGC committed material breaches of the contract specifications justifying the default termination on that alternative basis. "A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." <u>Thomas v. Dep't of Hous. & Urban Dev.</u>, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur L. Corbin, Corbin on Contracts § 1104 (1964)). Here, the government argues that "CGC materially breached the contract in numerous ways, most notably by its over-excavation and backfill with material not in compliance with the specifications, and not approved by USACE," and that "CGC's activity caused damage to the site that had to be repaired by the replacement contractor." Def.'s Cross-Mot. & Resp. at 42 (citing Pl.'s Mot. Ex. 82, ECF No. 54-5). Similarly, the government requests summary judgment regarding CGC's claims: 1) that it was entitled to an equitable adjustment of the contract deadline to respond to the wet soils, <u>id.</u> at 44–48, and 2) that USACE constructively changed the contract by requiring it to include a drainage system and to add a layer of shot rock to the runway, <u>id.</u> at 48–49.

The facts material to the resolution of these issues are intertwined with those that will determine whether the delays the project experienced were excusable ones, and they are equally technical for the most part. The Court, accordingly, declines to decide these issues via summary judgment for essentially the same reasons that it declined to grant summary judgment to CGC as described above.

### B.     <u>Summary Judgment Regarding CGC's Differing Site Conditions Claim</u>

On the other hand, the Court agrees that summary judgment for the government is appropriate as to CGC's claim that the presence of wet soils at the site constituted either a Type I or Type II "differing site condition." <u>See, e.g.</u>, Def.'s Cross-Mot. and Resp. at 44. The government is entitled to summary judgment because CGC has failed to provide any evidence that could establish the elements of either type of differing site condition.

To prevail on a Type I differing site condition, a contractor must establish, at a minimum, that "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions." <u>Int'l Tech. Corp. v. Winter</u>, 523 F.3d 1341, 1348 (Fed. Cir. 2008). Moreover, to establish a Type I differing site condition, the contractual representation must be an affirmative one. <u>Comtrol, Inc. v. United States</u>, 294 F.3d 1357, 1363

11

(Fed. Cir. 2002) (explaining that there can be no Type I differing site condition where "the specification did not affirmatively represent that only hard material would be encountered").

In this case, CGC does not identify any affirmative representation in the contract documents regarding the condition of the soils at the airstrip. Indeed, the contract explicitly placed the onus on CGC to determine the condition of the site itself, by conducting its own geotechnical investigation and preparing its own report. Pl.'s Mot. Ex. 5, at 36, ECF No. 54-1. (Statement of Work Spec. § 01 10 00, 1.3.1.5, which outlines the requirements of geotechnical report SP-3).

The government is also entitled to summary judgment to the extent that CGC is claiming a Type II differing site condition, i.e., that there existed "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1276 (Fed. Cir. 2001) (quoting FAR § 52.236-2(a)). CGC presents no evidence at all that it could not have reasonably anticipated that there would be a significant amount of wet soils at the site shortly after the winter season or that the conditions of the soil differed materially from what would ordinarily be encountered and generally recognized when undertaking similar work in the region.

Ultimately, CGC's differing site condition claim appears to be based entirely on a sentence in USACE's show cause notice stating that "the Government recognizes [the drainage system, material quantity overruns, and saturated soils] as either changes to the Contract or differing site conditions." Pl.'s Mot. at 42 (citing Pl.'s Mot. Ex. 66, ECF No. 54-5). CGC's reliance on this conclusory observation is unavailing. Even where a contracting officer's legal opinion is fully explained (unlike here), it is not binding on the government in judicial proceedings (which are de novo) and it cannot override the language of the contract itself. See Wilner v. United States, 24 F.3d 1397, 1401–02 (Fed. Cir. 1994). The government therefore is entitled to summary judgment as to CGC's claim that the wet soils represented a differing site condition for which it is entitled to damages.

### C. Summary Judgment Regarding Damages Issue

Finally, the government seeks summary judgment regarding CGC's entitlement to damages should the Court agree that the default termination was improper. The government notes that based on the testimony of CGC's expert, it appears that of the total damages it is seeking (approximate $3 million), almost half is associated with the default termination claim (as opposed to its differing site condition and constructive change claims). If the Court were to convert the termination into one for convenience, the government argues, then CGC would be required to make a termination settlement proposal to the contracting officer to be reimbursed for its costs. Def.'s Cross-Mot. & Resp. at 49–50.

The government is correct. It is "well-settled" that "in government contract cases in which a termination for default is found to be improper, it will be converted to a termination for the convenience of the government, and damages calculated accordingly." Keeter Trading, 79 Fed. Cl. at 262. Here, the contract incorporates FAR § 52.249-2(e). That provision states that if

the contract is terminated for convenience, the contractor must submit a termination settlement proposal to the CO to be reimbursed for its costs. Therefore, the government is entitled to summary judgment as to its claim that, should the Court find that the termination for default was improper, CGC may not recover damages attributable to the termination in this Court, but must instead file a termination settlement proposal with the CO.

## CONCLUSION

On the basis of the foregoing, CGC's motion for summary judgment is **DENIED.** The government's cross-motion for partial summary judgment is **GRANTED-IN-PART** as to CGC's differing site condition claim and as to the government's argument that CGC must file a settlement proposal with the CO in the event that the Court converts the default termination to one for convenience. Otherwise, the motion is **DENIED**.

The parties shall file a joint proposed pre-trial schedule within thirty days, consistent with Appendix A to the Rules of the Court of Federal Claims.

**IT IS SO ORDERED.**

                                           s/ Elaine D. Kaplan
                                           ELAINE D. KAPLAN
                                           Judge